UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

THE NOVOGRODER COS., INC.,      )
                                )
                    Plaintiff   )
                                )
        vs.                     )        CAUSE NO. 2:10-CV-193 RM
                                )
HARTFORD FIRE INSURANCE CO.,    )
                                )
                    Defendant   )

OPINION and ORDER

This cause came before the court on August 7, 2012 for hearing on the

motion of Hartford Fire Insurance Company for summary judgment on the claims

of the first amended complaint and on Hartford's motion to strike the affidavit of

George Novogroder filed by The Novogroder Companies, Inc. in support of its

summary judgment response. Based on the oral and written arguments of the

parties, the court grants in part and denies in part the motion to strike and grants

the summary judgment motion.


I. FACTS

The Novogroder Companies owned property in Danville, Illinois that, until

2005, housed a Walgreen's drug store. In 2007, the property, which remained

unoccupied, was vandalized – copper parts were stolen from the air conditioning

system [date of loss, May 15, 2007; Deft. Memo., Exh. 4] and the building's

heating and cooling systems [date of loss, May 18, 2007; Deft. Memo., Exh. 6] and electrical system [date of loss, June 4, 2007, Resp. Exh. YY, or July 4, 2007, Deft. Memo., Exh. 7] were damaged. Novogroder's property was insured under a policy issued to it by Hartford Fire Insurance Company. Novogroder notified Hartford about the property damage to the Danville premises on or about July 10, 2007, and George Novogroder received notification from Hartford, by letter dated July 27, that Douglas Cameron, Hartford's general adjuster, would be investigating the claims.

Mr. Novogroder says his counsel, Peter Koransky, advised Mr. Cameron that Novogroder didn't want to make any repairs until the building was rented or sold,[1] and Mr. Cameron agreed that while the property remained unoccupied, replacement of the heating, cooling, and electrical systems might invite further vandalism. The parties agreed on the total value of the damage, and on October 31, 2007, Hartford paid Novogroder the actual cash value of the losses. At the same time, Mr. Cameron advised Novogroder that it could file a supplemental claim for the replacement cost portion of the insurance moneys in accordance with the terms and conditions of the replacement cost provision of the policy "provided you notify us of your intent to do so within 180 days of the date of loss." Deft.

---

[1] George Novogroder testified that he hadn't read the insurance policy, G. Novogroder Dep. (July 6, 2011), at 20; he never read the replacement cost language of the policy, but relied on Peter Koransky and Douglas Cameron to do so, G. Novogroder Dep. (July 6, 2011), at 79-80; and he never had a conversation with Peter Koransky about the language of that provision. G. Novogroder Dep. (July 6, 2011), at 80.

Memo., Exhs. 10-12. In mid-November, Peter Koransky submitted notices to Mr. Cameron of Novogroder's intent to make future claims for the replacement cost funds "notwithstanding the fact that said repairs and restoration may not be completed until 180 days after" the dates of the losses. Resp., Exh. R.

The applicable insurance policy contains this provision on replacement cost coverage:

E.     Loss Payment and Valuation Conditions

Covered property will be valued at either replacement cost or actual cash value, as stated in the property choice declarations and as described below . . . . We will not pay more than your financial interest in the lost or damaged property.

1.     Replacement Cost

In the even of covered loss or damage, we will determine the value of the covered property at the actual amount spent to repair, replace or rebuild the damaged property as of the time of the loss or damage, at the same site or another site, subject to the following:

a.     We will not pay more for lost or damaged property than the least of:

(1) the limit of insurance applicable to the lost or damaged property;

(2) the amount it should cost to replace, on the same premises, the lost or damaged property with other property:
(a) of comparable material and quality; and
(b) used for the same purpose; or

(3) the amount you actually spend that is necessary to repair or replace the lost or damaged property with other property:

> (a) of comparable material and quality; and
>
> (b) used for the same purpose; or
>
> (4) in the event of a total loss to building property, you may choose to replace your building at another premises, however, we will not pay more than the cost to replace the property at the original premises.
>
> (5) Replacement cost does not include any increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.
>
> b.    We will pay on an actual cash value basis until the lost or damaged property is actually repaired, rebuilt or replaced.
>
> c.    If you do not repair, replace or rebuild on the same site or another site within 2 years of the date of loss, we will pay you on an actual cash value basis.

Deft. Memo., Exh. 40, pt. 2, at 15. The Replacement Cost Explanation of Payment documents sent to Novogroder in connection with each of the loss claims informed Novogroder that a supplemental claim could be filed "in accordance with the terms and conditions of the Replacement Cost Coverage provided you notify us of your intent to do so within 180 days after the date of loss." Deft. Memo., Exhs. 11-13. According to Mr. Novogroder, Mr. Cameron agreed on Hartford's behalf that Novogroder had no time limit to make repairs and file a supplemental loss claim.

Mr. Novogroder's attempts to rent or sell the Danville property were unsuccessful, so in late 2007 he entered into discussions with the Danville school district for the district's purchase of the property after Novogroder completed the

necessary repairs and renovations. The school district ultimately declined Mr. Novogroder's proposal for the project, so he revived his talks with the Latter Rain Fellowship Church in Danville, which had expressed interest in the building before Mr. Novogroder's negotiations with the school district. Church leaders toured the building and decided that the congregation couldn't afford to purchase the property and make the necessary renovations, so Mr. Novogroder offered to donate the building to the church.

Peter Koransky called Douglas Cameron on July 22, 2009 to tell him about the planned donation and followed up with a July 29 letter to Mr. Cameron, in which he stated: "As I advised you in our telephone conversation, George [Novogroder] has been in negotiations with the Latter Rain[] Fellowship Church in order to work out a donation of the subject property to the Church. It is the intention of the Church to rebuild in phases, with the first phase being the construction of the sanctuary. I would like to structure the donation to the Church in such a way that the balance of [the replacement cost funds] to be paid on the insurance claim can be paid contemporaneously with the consummation of the donation." Deft. Memo., Exh. 37. Mr. Novogroder claims Mr. Koransky's letter demonstrates that Novogroder "intended to perform repairs or replacements necessary to recover the replacement costs prior to transfer to the Danville church." Resp., ¶ TT.

In an undated letter Mr. Koransky says he received from Douglas Cameron on or about August 17, 2009, Mr. Cameron informed Novogroder that the replacement cost funds weren't recoverable because Novogroder hadn't undertaken any repairs to the building that would exceed the actual cash value amount that had already been paid [citing policy subsection 1.a.(3)] and because the losses occurred more than two years prior to any repairs being made [citing policy subsection 1.c.]. Resp., Exh. UU. Mr. Koransky wrote to Mr. Cameron two days later asking that Hartford withdraw the two-year requirement to repair, replace, or rebuild because, Mr. Koransky said, "Hartford clearly agreed that the balance of the [actual cash value] claims would be paid at such time as the repairs and/or replacement was completed, irrespective of any time limitation." Resp., Exh. VV. Mr. Cameron responded to Mr. Koransky's withdrawal request in a letter dated September 2, stating that although Hartford had waived the 180-day reporting requirement, the company couldn't change or waive any policy language and wouldn't pay the replacement cost moneys to Novogroder because "[t]here have been no repairs on the building that exceeded the actual cash value amount paid . . . and the loss dates [of] 5/15/07, 6/4/07, and 5/18/07 [are] past the 2-year requirement to repair, replace, or rebuild." Resp. Exh. YY.

Mr. Koransky made a formal demand on behalf of Novogroder in December 2009 for payment of the remaining amounts due under the replacement cost provision of the policy. Novogroder reports that after Hartford stated two more

times that it hadn't waived the two-year limitation period to repair or rebuild, Novogroder formally donated the property to the Latter Rain Fellowship Church on August 23, 2010. Novogroder claims that it "only proceeded to donate the building to the church without any repairs being performed after Hartford had reneged on its agreement to pay the balance of the replacement cost." Resp., at 10, ¶ BBB.

Novogroder sued Hartford in Lake County, Indiana on May 11, 2010 alleging that Hartford wrongfully denied Novogroder's request for the replacement cost value of the insurance policy; Hartford removed the complaint to this court. Novogroder filed its first amended complaint on February 2, 2012 based on Hartford's alleged breach of the insurance contract. Novogroder seeks recovery of the replacement cost value of the policy, consequential damages, fees, and costs. Hartford has moved for summary judgment on all of Novogroder's claims and also asks that several paragraphs of George Novogroder's affidavit be stricken.

## II. MOTION TO STRIKE

Hartford moves to strike portions of George Novogroder's affidavit submitted in support of Novogroder's summary judgment response. Hartford challenges statements Mr. Novogroder made in paragraphs 4, 10-14, and 16-18 of his affidavit as containing improper legal conclusions and as being contradictory of his deposition testimony, the testimony of other witnesses, Novogroder's answers

to requests for admissions and interrogatories, and facts asserted by Novogroder in its summary judgment response brief. The Federal Rules of Civil Procedure provide that affidavits used to support or oppose a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). Thus, affidavit statements should be disregarded if they contain conclusory allegations lacking supporting evidence; legal argument; self-serving statements without factual support in the record; inferences or opinions not grounded in observation or other first-hand experience; or mere speculation or conjecture. Josleyn v. Hydro Aluminum N.A., Inc., No. 3:07-CV-392, 2009 WL 4556735, at *1 (N.D. Ind. Jan. 22, 2009).

*Paragraphs 4 and 11*

Hartford seeks to strike paragraphs 4 and 11 from Mr. Novogroder's affidavit as containing legal conclusions not supported by facts in the record. Hartford says paragraph 4 misinterprets the replacement cost provision of the insurance policy, so the court shouldn't consider it as a legal conclusion, and Mr. Novogroder has no personal knowledge to support his legal conclusion in paragraph 11 that Hartford received a benefit by adjusting the insurance claim.

Novogroder responds that those paragraphs don't contain legal conclusions, and the court agrees. Neither Mr. Novogroder's understanding of the replacement

cost coverage nor his belief, which he labels as a "reasonable inference," that Hartford would receive a benefit by delaying payment of funds is a legal conclusion that would bind the court. Hartford's motion to strike paragraphs 4 and 11 is denied.

*Paragraphs 10 and 14*

Hartford first says Mr. Novogroder's statement in paragraph 10 that his intention was "to donate the land aspect of the Danville property" contradicts his deposition testimony. Hartford points to Mr. Novogroder's testimony relating to Novogroder's agreement with the school district – Novogroder would make necessary repairs to the building and the grounds and donate the building and property to the school district in exchange for the district's reimbursement of Novogroder for the amounts expended to make those renovations [G. Novogroder Dep. (Dec. 2, 2011), at 104-106, 111-112] – and Novogroder's agreement with the church – Novogroder would donate the building in an "as is" condition [G. Novogroder Dep. (July 6, 2011), at 62-63] – as contrary to his affidavit statement that he intended to donate the "land aspect" of the property.

Hartford also challenges Mr. Novogroder's statement in paragraph 10 that his intent had always been to "perform repairs or renovations to the building prior to the transfer to . . . the church" and his statement in paragraph 14 that he would have structured the transfer to the church "as a long term lease if repairs

or rebuilding could have been accomplished." Hartford notes Mr. Novogroder's contrary deposition testimony about Novogroder's plans relating to the church:

Q    Did you have any discussions with the church about the church purchasing the building?
A    No. They were willing to accept the building as a donation. They were looking for a new location.
Q    Did you offer to perform any repairs to the building before donating it to the church?
A    No.
Q    Did you have any discussions with the church about performing any repairs to the building after it was transferred to them?
A    No.

G. Novogroder Dep. (July 6, 2011), at 18-20; *see also* G. Novogroder Dep. (July 6, 2011), at 62-63 ("Actually, the discussions with the church were the building as is."). Hartford says Mr. Novogroder's affidavit statements about his intentions to donate the "land aspect" of the Danville property and perform repairs to the building before transferring it to the church should be stricken.

Mr. Novogroder explains that paragraph 10 contains his explanation of the word "donation" and doesn't indicate that he had no intention to repair or replace the damage to the building. Mr. Novogroder says the school corporation would only accept a completed building and his attorney "put in writing the intention that Novogroder sought the replacement cost coverage and wanted to structure the transfer to the church to obtain same." Resp., at 3. Mr. Novogroder also claims that, per his statement in paragraph 14, his donation to the church "may have been" structured as a long-term lease had the repairs or rebuilding been accomplished.

While the evidence supports Mr. Novogroder's claim that his intent was to recover the replacement cost coverage, the evidence doesn't support his statement that he intended to repair the building for the church. Mr. Novogroder testified at his deposition, as did Pastor Donald Prouty at his, *see* Deft. Memo., Exh. 24, p. 19, that Novogroder didn't offer or intend to make repairs to the building prior to donating the property to the church. *See* G. Novogroder (July 6, 2011) Dep., pp. 62-63. Mr. Novogroder's contrary affidavit statements in paragraphs 10 and 14 relating to Novogroder making repairs or doing rebuilding for the church must be stricken.

*Paragraphs 12 and 13*

Hartford says Mr. Novogroder's statements in paragraphs 12 and 13, about the timing of his offer to donate the building to the church and his claim that Novogroder made no repairs to the building only because Hartford wouldn't pay the replacement cost portion of the insurance funds, are in conflict with his deposition testimony. According to Hartford, Mr. Novogroder testified that his offer to donate the building to the church was in an "as is" condition and he never offered or discussed making any repairs to the building prior to its donation to the church, citing as support George Novogroder's deposition testimony (July 6, 2011), at pp. 19-20, 62-63. Hartford says Mr. Novogroder's affidavit statements also contradict deposition testimony by Donald Prouty, pastor of the Latter Rain

Fellowship Church, who confirmed that he and Mr. Novogroder didn't discuss Novogroder making any repairs to the building, Mr. Novogroder didn't offer any assistance from Novogroder in making the repairs, and the parties had no discussions about a purchase of the building by the church. *See* D. Prouty Dep., at 18-19, 34-35. Hartford concludes that because the statements in paragraphs 12 and 13 of Mr. Novogroder's affidavit contradict deposition testimony and were submitted by Novogroder in an attempt to create an issue of fact, those paragraphs should be stricken.

Novogroder claims Mr. Koransky's correspondence with Hartford establishes that Novogroder was trying to structure the donation to the church so that Novogroder could recover the replacement cost coverage. Novogroder says the evidence establishes that "the Church would need construction necessary to make it suitable for use," and while Mr. Novogroder didn't have any discussions with the church about making those repairs, "Hartford did not probe the timing of any discussions." Resp., at 4.

George Novogroder's statements in paragraphs 12 and 13 that he was willing to make repairs for the church but that Hartford precluded him from doing so are contrary to his deposition testimony and that of the church pastor, who both said they agreed from the outset of their discussions that Novogroder would donate the property to the church in an "as is" condition. In addition, Mr. Koransky wrote in his July 29, 2009 letter to Douglas Cameron that Novogroder

wanted to receive the replacement cost moneys at the same time it donated the property to the church, with no indication that Novogroder was to aid or be involved with the church's rebuilding efforts. Mr. Novogroder's statements in Paragraphs 12 and 13 that Hartford precluded Novogroder from making any repairs are stricken.

*Paragraphs 16, 17, and 18*

Hartford lastly argues that Mr. Novogroder's statements in paragraphs 16-18 that he purchased other properties to serve as a replacement for the Danville property should be stricken because (1) before submitting Mr. Novogroder's affidavit, Novogroder never claimed to have purchased any property to replace the Danville property; (2) Mr. Novogroder testified at his deposition that he didn't have "any plans to make any repairs or replacement to the building," G. Novogroder Dep. (July 6, 2011), at 67; and (3) Mr. Novogroder's affidavit statements contradict Novogroder's answers to Hartford's requests for admissions [Reqs. 1, 5, and 8] and interrogatories [No. 7] where, Hartford says, Novogroder admitted that the Danville building hadn't been repaired or replaced.

Novogroder responds that paragraphs 16-18 set forth information that Novogroder "essentially replaced the Danville property's income stream with two other income streams by purchasing two other Walgreens-leased facilities," Resp., at 6, information that doesn't contradict Mr. Novogroder's deposition testimony

that Novogroder never performed any repair work on the Danville property. According to Novogroder, "[b]ased on the language of the 2006 policy, Novogroder is not limited to replacing the damage, but it can replace the purpose and income stream of the Danville property with other property," so those replacement properties "should be sufficient for Novogroder to recover the replacement cost coverage under the policy." Resp., at 7.

Mr. Novogroder's affidavit statements were the first mention of acquiring "replacement" property; no mention was made of that property in the discovery responses or in any deposition testimony by Mr. Novogroder or Attorney Koransky. Mr. Novogroder certainly bought the properties as he claims, but his affidavit statements that the properties were purchased as replacements for the Danville property are inconsistent with his deposition testimony and, so, are stricken.[2]

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving

---

[2] Hartford notes in its reply that the insurance policy provides that "[i]n the event of a total loss to the building property, you may choose to replace your building at another premises," *see* Policy, at E.1.a.(4), and says that because the Danville property wasn't a total loss, Novogroder couldn't comply with the terms of that provision by purchasing an unrelated building at another location. Reply, at 8. Even if the court were to consider Mr. Novogroder's affidavit statements about Novogroder's purchase of the additional properties, the record contains no evidence from which a fact-finder could conclude that the Danville property was a total loss and that Novogroder had complied with the terms of the policy relating to replacing the building at another location.

party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, 477 U.S. at 255. The existence of an alleged factual dispute, by itself, will not defeat a summary judgment motion; "instead, the nonmovant must present definite, competent evidence in rebuttal," Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004), and "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007); *see also* FED. R. CIV. P. 56(e)(2). "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." Hastings Mut. Ins. Co. v. LaFollette, No. 1:07-cv-1085, 2009 WL 348769, at *2 (S.D. Ind. Feb. 6, 2009); *see also* Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003) ("summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events'" *(quoting* Schacht v. Wisconsin Dep't of Corr., 175 F.3d 497, 504 (7th Cir. 1999)).

## IV. Discussion

The claims of the first amended complaint are brought pursuant to 28 U.S.C. § 1332(a) and, as the court previously determined, Illinois law applies to the parties' dispute. *See* Op. and Ord. (May 30, 2012), at 2-4. To prevail on its breach of contract claim, then, Novogroder must establish an offer and acceptance, consideration, definite and certain terms, its performance of all required conditions, a breach by Hartford, and damages. Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 560 (7th Cir. 2012); MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC, 845 N.E.2d 22, 30 (Ill. App. Ct. 2006). Hartford maintains Novogroder can't prevail on its claim because Novogroder can't establish that it performed the requirements of the insurance policy that would entitle it to receive the replacement cost funds in addition to the actual cash value payment it already received. Hartford says to be eligible to receive the replacement cost funds, Novogroder was required, first, to spend funds in excess of the actual cash value amount to actually repair or rebuild the damaged property and, second, repair or rebuild the damaged property within two years of the date of the loss. Because Novogroder didn't satisfy those conditions, Hartford says Novogroder isn't entitled to receive the replacement cost moneys and can't recover on its breach of contract claim, entitling Hartford to summary judgment on Count 1.

Hartford also seeks summary judgment on Novogroder's remaining claims that Hartford waived the two-year limitation requirement of the replacement cost

provision of the policy and should be estopped from denying further payment to Novogroder. According to Hartford, the requirement of repairing or rebuilding within the two-year period is clearly set forth in the policy, and Hartford sent correspondence to Novogroder as the two-year deadline approached reminding Novogroder about the limitation period. Hartford says it's entitled to summary judgment on the waiver, estoppel, and equitable estoppel claims of the first amended complaint because Novogroder can't establish that Hartford waived the condition that Novogroder comply with the two-year limitation period contained in the replacement cost provision of the policy.

Novogroder first argues that the two-year limitation provision of the insurance contract is ambiguous. According to Novogroder, the provision isn't "written similar to a limitation period discussed in the reported cases. The result after two years is not described. It does not state that replacement cost is waived or forfeited after two years. The language could mean that during two years after the date of loss, the insured receives the Actual Cash Value. . . . It is written like a guideline, not a forfeiture provision. Any ambiguity of the provision should be construed against Hartford, and Novogroder should not be barred from recovering the replacement cost portion." Resp., at 15.

"Under Illinois law, an insurance policy is a contract, and the same rules of construction that apply to other types of contracts apply to insurance contracts." Archer Daniels Midland Co. v. Burlington Ins. Co. Group, Inc., 785 F.

Supp. 2d 722, 727 (N.D. Ill. 2011). A contract is enforceable "if from its plain terms it is ascertainable what each party has agreed to do." Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 564 (7th Cir. 2012). Interpretation of the terms of an insurance contract is a matter of law; the court must examine the language of the policy and give "the words their plain and ordinary meaning." Ace American Ins. Co. v. RC2 Corp., Inc., 600 F.3d 763, 767 (7th Cir. 2010); Travelers Indem. Co. v. Markham Home Improvements Corp., No. 2-10-0217, 2011 WL 2222130, at *2 (Ill. App. Ct. Mar. 9, 2011) ("A court's primary objective is to ascertain and give effect to the parties' intent as expressed in the agreement.").

"As with the determination of all other terms, ambiguities must be considered in light of the policy in its entirety." United National Ins. Co. v. Fasteel, Inc., 550 F. Supp. 2d 814, 821 (N.D. Ill. 2008). "Terms are ambiguous if they are reasonably susceptible to more than one interpretation, 'not simply if the parties can suggest creative possibilities for their meaning.' Ambiguous terms are construed against the drafter of the policy, but a court should not search for ambiguities where none exist[]." Kay-Woods v. Minnesota Life Ins. Co., 622 F. Supp. 2d 704, 706 (S.D. Ill. 2009) (quoting BASF AG v. Great American Assurance Co., 522 F.3d 813, 819 (7th Cir. 2008)). "A contract is not rendered ambiguous simply because the parties disagree as to how it should be understood." ExxonMobil Oil Corp. v. Amex Const. Co., Inc., 702 F. Supp. 2d 942, 973 (N.D. Ill. 2010).

The challenged policy language is found in the section of the policy entitled "Loss Payment and Valuation Conditions," which informs the insured that "[c]overed property will be valued at either Replacement Cost or Actual Cash Value. . . . [Hartford] will pay on an Actual Cash Value basis until the lost or damaged property is actually repaired, rebuilt or replaced. If you do not repair, replace or rebuild on the same site or another site within 2 years of the date of loss, [Hartford] will pay you on an Actual Cash Value basis." The terms of that policy section clearly state that property will valued under either a replacement cost value or an actual cash value, the insured will be paid the actual cash value until the insured property is repaired, rebuilt, or replaced, and if the repair, rebuilding, or replacement isn't completed within two years of the date of loss, no additional moneys, *i.e.*, no replacement cost value, will be paid on the property.

While Novogroder suggests some alternative interpretations of the challenged language and complains that the provision doesn't specifically state that replacement cost is "waived or forfeited" after two years, "[t]he question is whether [the] provision is subject to more than one reasonable interpretation, not whether other possibilities can be suggested." Continental Cas. Co. v. Duckson, 826 F. Supp. 2d 1086, 1099 (N.D. Ill. 2011); Nicor, Inc. v. Associated Elec. and Gas Ins. Services Ltd., 860 N.E.2d 280, 286 (Ill. 2006) ("That a term is not defined by the policy does not render it ambiguous, nor is a policy term considered ambiguous merely because the parties can suggest creative possibilities for its

meaning. Rather, ambiguity exists only if the term is susceptible to more than one reasonable interpretation."). Consideration of the policy provision as a whole won't support a finding that the two-year limitation period is ambiguous.

Novogroder next claims that "[g]ood faith and fair dealing required Hartford to disclose that the replacement cost value would be forfeited after two years from the date of loss." Resp., at 16. According to Novogroder, Hartford was able to keep the higher premiums paid by Novogroder "based on an arbitrary time period," while Novogroder "was focusing on repairing or rebuilding the damage based on the parties' agreement, discussions and correspondence." Resp., at 16. The duty of good faith and fair dealing implied in every contract in Illinois requires parties to use "reasonable efforts to bring about the occurrence of conditions precedent within their control." E.B. Harper & Co., Inc. v. Nortek, Inc., 104 F.3d 913, 919 (7th Cir. 1997); see also Tatom v. Ameritech Corp., 305 F.3d 737, 745-746 (7th Cir. 2002) (covenant of good faith and fair dealing is read into all Illinois contracts "absent express disavowal"); Midwest Builder Distributing, Inc. v. Lord and Essex, Inc., 891 N.E.2d 1, 26 (Ill. App. Ct. 2007) ("Where the performance of the contingency or condition is within the control of a party to the agreement, the party for whose benefit the condition precedent runs is required to use 'reasonable efforts' to have it occur."). Parties to a contract "are entitled to enforce the terms of the contract to the letter and an implied covenant of good faith cannot overrule

or modify the express terms of a contract." <u>Northern Trust Co. v. VIII South Michigan Assocs.</u>, 657 N.E.2d 1095, 1104 (Ill. App. Ct. 1995).

Hartford insists it informed Novogroder of the existence of the two-year period – Novogroder was provided with a copy of the policy, which sets forth the two-year period in the Replacement Cost section, and Replacement Cost Explanation documents, which instruct that all supplemental claims be filed "in accordance with the terms and conditions of the Replacement Cost Coverage" provision of the policy. Hartford also says it reminded Novogroder that the two-year period was fast approaching – Douglas Cameron requested an update from Novogroder on the status of the Danville property claim by letters dated April 13, 2009 [Deft Memo., Exh. 17 ("We are coming up on 2-years since the date of loss. Any status updates.")] and May 5, 2009 [Deft. Memo., Exh. 18 ("I note we are coming up on 2-years since the date of loss. Please advise status of this claim.")], and, on May 11, sent another letter to Novogroder seeking information about the status of the claim [Deft. Memo., Exh. 20 ("We are writing to advise that processing your claim has been delayed for the following reason(s). We have not yet received: We are aware negotiations are underway with the school district and await those results.")]. The evidence shows, too, that Peter Koransky, Novogroder's counsel, understood that the two-year period required repairs to be made within that time – Mr. Koransky says that toward the end of two-year period, he asked

Mr. Cameron whether there was something Novogroder needed to do "to preserve [its] rights" under that provision. Koransky Dep., pp. 27-32, 42-43.

Novogroder is correct that the insurance policy doesn't specifically state that the replacement cost value is "forfeited" after two years, but Hartford has presented unrebutted evidence that Novogroder was provided with notice of the two-year limitation period and that Novogroder, through its counsel, was aware of the time limitation. *See* National Production Workers Union Ins. Trust v. Life Ins. Co. of North America, No. 05-cv-5415, 2010 WL 1292429, at *9 (N.D. Ill. Mar. 29, 2010) ("Illinois law imposes a duty on an insured to review the terms of an insurance policy issued to him and to know the contents of that policy."); Golf v. Henderson, 876 N.E.2d 105, 111 (Ill. App. Ct. 2007) ("An insured has an affirmative duty to review the terms of a new policy issued to him and is burdened with knowing the contents of that policy."). Novogroder hasn't come forth with evidence that would support a finding that Hartford's actions weren't "reasonable efforts to bring about the occurrence of conditions precedent within [Novogroder's] control." E.B. Harper & Co., Inc. v. Nortek, Inc., 104 F.3d 913, 919 (7th Cir. 1997); *see also* Voyles v. Sandia Mortg. Corp., 751 N.E.2d 1126, 1133 (Ill. 2001) ("Although it certainly would have been helpful for the defendant to have given the borrower an explanation for the increase when the new payment booklet was sent, the defendant's failure to do so did not excuse the plaintiff's subsequent refusal to make the required payments.").

Novogroder also argues that while no repairs were made to the damaged property within two years of the loss date, Hartford waived that time constraint. Novogroder insists Peter Koransky reached an understanding with Douglas Cameron that Novogroder could hold off making repairs until the property was sold or rented, yet Hartford raised "an arbitrary period after [the two-years] had passed." Resp., at 17. Novogroder notes Mr. Koransky made a formal demand on Novogroder's behalf for receipt of the replacement cost value and explained Novogroder's position on the issue in a December 16, 2009 letter to Douglas Cameron:

> To date, [Hartford] has paid only actual cash value and has failed to pay the [] balances, which constitute the amounts due under the full replacement cost feature of the [insurance] policy. [Novogroder] purchased the policy with full replacement cost coverage and paid an additional premium for that additional enhanced coverage feature [and] paid additional premiums in order that the payment of any losses would be on the basis of full replacement cost and not actual cash value. . . . If there is a basis to limit [Novogroder's] recovery of full replacement cost, [Hartford] has not established a reason for the assertion, and, in any event, . . . such a limitation has been waived. . . . As acknowledged by you in your correspondence of September 2, 2009, [Hartford] waived the supplemental proof of claim and the one hundred eighty day language set forth in the respective Proofs of Loss. Notwithstanding your assertion that [Hartford] has not waived the two-year limitation, the same conduct that supports the waiver of the supplemental claim under the 180-day provision also constitutes the basis for the waiver of the two-year time limitation. At no time did [Hartford] notify [Novogroder] that [Hartford] would rely on a two-year limitation to complete repairs as a basis for the denial of the claims until after the subject two-year period had expired. . . . As set forth above, [Hartford's] contention that the policy has limitations, resulting in [Novogroder] only being entitled to an actual cash value payment, is without merit and, further, limitations, if any, have been waived by the conduct of [Hartford].

Resp., Exh. ZZ. Novogroder maintains that based on the parties' agreement to waive the two-year period, Hartford should be estopped from denying Novogroder recovery of the replacement cost value of the property.

Waiver is the intentional relinquishment of a known right, which can arise either expressly or by conduct inconsistent with an intent to enforce a contract provision. <u>Midwest Builder Distributing, Inc. v. Lord and Essex, Inc.</u>, 891 N.E.2d 1, 28 (Ill. App. Ct. 2007). "The party claiming an implied waiver has the burden of proving a clear, unequivocal, and decisive act of its opponent manifesting an intention to waive its rights." <u>In re Nitz</u>, 739 N.E.2d 93, 103 (Ill. App. Ct. 2000). To establish equitable estoppel under Illinois law, Novogroder "must prove that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." <u>Wigod v. Wells Fargo Bank, N.A.</u>, 673 F.3d 547, 566 (7th Cir. 2012) (<i>quoting</i> <u>Newton Tractor Sales, Inc. v. Kubota Tractor Corp.</u>, 906 N.E.2d 520, 523-524 (Ill. 2009)).

Novogroder can't carry its burden under either theory. Novogroder says Mr. Koransky made clear to Hartford Novogroder's plan to delay making repairs to the Danville property, and Hartford's conduct amounted to a waiver of the two-year limitation period, but Novogroder hasn't pointed to a "clear, unequivocal, and decisive act" or an "unambiguous promise" by Hartford evidencing Hartford's intention to waive the two-year period. Novogroder has established that Hartford

24

waived the 180-day reporting requirement, and Hartford doesn't dispute that waiver, but Novogroder hasn't pointed to evidence that would support a finding that Hartford's waiver of that 180-day period included an agreement to waive the two-year limitation period. Even if Hartford could have somehow expected or foreseen that Novogroder would believe and rely on the fact that the two-year period was waived, Novogroder hasn't set forth any evidence showing that it made any repairs or undertook any rebuilding of the Danville property as required to recover the replacement cost coverage.

Novogroder additionally claims that Hartford imposed an "arbitrary" limitation period. The court can't agree. The term arbitrary is defined as "existing or coming about seemingly at random or by chance or as a capricious and unreasonable act of will," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 63 (11th ed. 2003); *see also* BLACK'S LAW DICTIONARY 119 (9th ed. 2009) ("Depending on individual discretion; specif., determined by a judge rather than by fixed rules, procedures, or law."). The insurance policy contains a specific two-year limitation period, so Hartford's reliance on that two-year period doesn't qualify as arbitrary. Too, the record doesn't support Novogroder's claim that it was focusing on and intending to make repairs to the Danville property. According to Novogroder, the property "is currently being repaired and rebuilt by Latter Rain Fellowship, reflecting the intent to make the property usable." Resp., 17. That the church is repairing and rebuilding the property for its own use doesn't show that Novogroder

had any intent to repair or rebuild the property for the church, whether within the limitation period or not. To the contrary, Mr. Novogroder testified at his deposition that he didn't discuss with church officials Novogroder's making any repairs to the building, and he and church officials agreed that the donation of the property was to be in an "as is" condition. *See* G. Novogroder Dep. (July 6, 2011), at 62-63; D. Purdy Dep., at 18-19, 34-35.

Lastly, a review of the cases relied on by Novogoder at the summary judgment hearing convinces the court that those cases don't provide support for Novogroder sufficient to defeat summary judgment. In <u>Pick v. Associates Indem. Corp.</u>, 547 N.E.2d 555 (Ill. App. Ct. 1989), recovery under policy required the insured to provide certain documents and submit to an examination under oath. The facts showed that the insured submitted numerous documents and was examined under oath for 1-1/2 hours, and the question for consideration was whether the plaintiff's actions amounted to substantial compliance with the policy. Novogroder, in contrast, didn't make any repairs or undertake any rebuilding before or after the two years following the date of loss, so the question of "substantial compliance" isn't at issue. In <u>Rockford Mut. Ins. Co. v. Pirtle</u>, 911 N.E.2d 60 (Ind. Ct. App. 2009), the court found that Pirtle had been hindered from making any repairs as required under the policy by Rockford's refusal to advance the moneys necessary for Pirtle to be able to commence the work. In contrast, Novogroder received the actual cash value amount at the outset and could have

used those funds to repair the property, which could have entitled it to recover the replacement cost value under the terms of the policy.

As already noted, to prevail on its breach of contract claim, Novogroder must establish an offer and acceptance, consideration, definite and certain terms, its performance of all required conditions, a breach by Hartford, and damages. <u>Wigod v. Wells Fargo Bank, N.A.</u>, 673 F.3d 547, 560 (7th Cir. 2012). Novogroder hasn't pointed to evidence that would support a finding that it performed any of the required conditions. Novogroder says it should be entitled to recover the replacement cost because it paid extra premiums to recover that coverage, *see* G. Novogroder Dep. (July 6, 2011), at 71, but the insurance policy contains additional requirements for recovery of the replacement cost: repair, rebuild, or replace the damaged property, and repair, replace or rebuild within two years of the date of loss. Even if Hartford had waived the two-year limitation period, Novogroder doesn't dispute that it didn't repair or rebuild the Danville property as the policy required. Viewing the record as favorably to Novogroder as is reasonably possible, Novogroder can't demonstrate that it complied with the required conditions of the insurance policy and, so, can't prevail on its claims.

IV. Conclusion

Based on the foregoing, the court

(1) GRANTS in part and DENIES in part the motion of Hartford Fire Insurance Company to strike portions of George Novogroder's affidavit [docket # 67];

(2) GRANTS the motion of Hartford Fire Insurance Company for summary judgment [docket # 64] on the claims of the first amended complaint;

(3) VACATES the final pretrial conference set for September 10, 2012 and the jury trial scheduled to commence on September 25, 2012; and

(4) DIRECTS that judgment be entered for the defendant.

SO ORDERED.

ENTERED:  __August 21, 2012__


　　　　　　　　　　__/s/ Robert L. Miller, Jr._____
　　　　　　　　　　Judge, United States District Court